IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

GWENDOLYN OWEN,                :

      Plaintiff,                :

                                     Case No. 3:02cv179

          vs.                 :

                                       JUDGE WALTER HERBERT RICE

JAMES B. PEAKE, SECRETARY      :
OF VETERANS AFFAIRS,[1]

                                    :

      Defendant.

---

DECISION AND ENTRY SUSTAINING, IN PART, AND WITHHOLDING
JUDGMENT, IN PART, ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DOC. #37); INSTRUCTIONS TO PARTIES

---

The Defendant Secretary of Veterans Affairs ("Secretary") employed the

Plaintiff Gwendolyn Owen in various capacities at the Dayton Veterans Affairs

("DVA") Medical Center, Dayton, Ohio, beginning in November 1998. In

September 1999, Owen reported that she had been sexually assaulted by Sergeant

Richard Morin, an officer with the DVA police force, while she was at work in the

Compensation and Pension Department. The present case revolves around that

alleged assault, as well as around allegations of retaliatory actions taken as a result

of Owen's report of the assault. Specifically, Owen brings suit alleging both

---

[1]The Secretary of Veterans Affairs at the time the Plaintiff commenced this litigation was Anthony J. Principi. The current Secretary of Veterans Affairs, who is automatically substituted as a party defendant in accordance with Federal Rule of Civil Procedure 25(d), is James B. Peake.

discrimination based on co-worker hostile work environment sexual harassment, in violation of Title VII (42 U.S.C. § 2000e *et seq.*), and retaliation for filing an EEO complaint of discrimination, also in violation of Title VII. Doc. #1.  The Secretary moves for summary judgment, challenging the sufficiency of Owen's evidence as to her *prima facie* cases of hostile work environment sexual harassment and retaliation. Doc. #26; Doc. #37.[2]


I.    FACTS[3]

A.    Facts Surrounding the Incident of September 1, 1999

Prior to the alleged assault in September, 1999, Owen and Sergeant Morin had interacted on a number of occasions, while working at the DVA. Doc. #25 (Owen Dep. July 24, 2003) at 17-21.  During those interactions, Morin asked Owen to dinner and other places and to accompany him on several trips. Id. at 18-19.  Owen never accepted any of these invitations. Id. at 26.  In the summer of

_____

[2]The Secretary originally moved for summary judgment, on these same two points, at Document #26.  As a result of the Plaintiff's request for an extension of time to finish discovery and file a response to said Motion (Doc. #27), the Court overruled, without prejudice to renewal, the Secretary's Motion for Summary Judgment, while sustaining Plaintiff's Motion for Extension of Time (Doc. #30). The Secretary has now renewed his original Motion for Summary Judgment (incorporating the same therein), at Document #37.

[3]Since this case comes before the Court on the Defendant's Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiff, as the party against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

2

1999, Morin invited Owen to see him socially at his office in the DVA Police Service after work, and Morin accepted this invitation. Id. at 19. After talking for some time, Morin walked Owen to her car and attempted to kiss her. Id. at 20-22. While moving away in an attempt to divert him from the kiss, Owen hugged him instead. Id.

On Wednesday, September 1, 1999, Owen was working late in a small office. Id. at 29-30, 33. Morin came to the office, talked for a few minutes and then left. Id. at 30. Owen resumed her work and before she realized what was happening, Morin returned and was kissing her. Id. A verbal interchange then occurred, wherein Morin told Owen that he had been wanting to kiss her for a while and that he also wanted to hold her, with Owen responding that such actions would not be appropriate given that Morin was married and had children Owen's age. Id. at 30-31. Morin then asked Owen if he could close the office door. Id. at 31. Although she responded "no", he closed the door anyway, walked over and sat on the desk, and grabbed Owen's hand and tried to pull her towards him. Id. The two struggled until Owen broke free and then left the office. Id.

About 3:00 p.m. the next day, Thursday, September 2, Owen met with her supervisor, Ellen DiVincenzo, and told her about the incident of the preceding day. Id. at 35. At that time, DiVincenzo attempted to contact the DVA's EEO counselor, Woodrow Hudson. Id. at 36-37. Because Hudson was not available, DiVincenzo gave Owen the telephone number to the Veterans Affairs Office of

3

Resolution Management ("ORM"), in Cleveland. Id. The following day, Friday,

September 3, DiVincenzo arranged for Owen to meet with Hudson to discuss the

September 1 incident. Id. at 37. Owen was unhappy with the way her meeting

with Hudson went, in that he demanded that she show him where the assault

occurred while others were present in the office and then proceeded to question

her about the assault, in the presence of her co-workers. Doc. #51, Ex. L (Owen

Aff.) ¶ 4. Hudson then prepared an incident report, which Owen felt was

incomplete. Doc. #25 (Owen Dep. July 24, 2003) at 39.

Following the Labor Day weekend, on Tuesday, September 7, 1999, Owen

met with Chief Parrott, of the DVA Medical Center Police and Security Service. Id.

at 39. At that meeting, she gave Parrott a statement that she had prepared about

the September 1 incident and they talked about that incident. Id. at 39-40. Owen

alleges that, during this meeting, Parrott's attitude and demeanor indicated that he

was "openly disbelieving" of what she had to say. Id. at 76. Sometime during the

week of September 7, Parrott instructed Morin to stay out of Owen's work area.

Id. at 43-44.

In the meantime, during this same week, Owen saw Morin three or four

times in a common area of the building when he was accessing a closet that

housed police equipment. Id. at 44. There was no interaction, either verbal or

physical, between Owen and Morin during these times. Id. at 44-45. At the end of

the week, Owen reported her sightings of Morin to her supervisor. Id. at 51-52. At

4

some point during this week, as a result of seeing Morin in her work area and because Owen's supervisor allegedly told her that the VA was not taking the accusations seriously, Owen contacted the ORM. Id. at 46.[4] She did not see Morin again until a couple of months later. Id. at 51-52.

At the end of the week, on Friday, September 10, 1999 (eight days after Owen initially reported the alleged assault to her supervisor), the facility director, Dr. Steven Cohen, communicated with the VA network EEO director. Id. at 47-49. That same day, Cohen ordered Morin put on administrative leave, beginning Monday, September 13, 1999, pending an investigation into the allegations. Id. As to that decision, Dr. Cohen states:

> I was upset with the way [the allegations were] handled initially internally. I think they looked at it as more of a - - kind of a boyfriend/girlfriend, kind of dismissing it, and that they didn't consider it as a serious problem. And I think it was like on a Friday morning or Thursday evening, I learned that there were allegations of physical, really unwanted physical contact, that we immediately - - I immediately ordered them to take administrative action and remove Morin from the workplace. I think that at the time, it was maybe Friday afternoon and he was supposed to be dispatched and Ms. Owen was not going to be at the medical center for the weekend. So rather than put a hole in that schedule, I think we may have held if off until Monday morning and then he was put on administrative leave.

Doc. #51, Ex. K (Cohen Interview) at 7. As part of the order placing Morin on administrative leave, he was restricted from being at the DVA unless he had a prearranged police escort. Doc. #25 (Owen Dep. July 24, 2003) at 49. On the

_____

[4]Owen's supervisor, DiVincenzo, denies telling Owen that the VA was not taking her allegations seriously. Doc. #26, Ex. A (DiVincenzo Aff.) ¶ 7.

5

following Monday (September 13, 1999), Owen filed an informal EEO Complaint of sexual harassment with the ORM. Id. at 53.

An investigative board began an on-site investigation into Owen's allegations on September 20, 1999. Id. at 54. The board concluded its investigation by a report dated November 8, 1999, wherein it substantiated Owen's allegations and recommended that corrective action be taken against Morin. Doc. #51, Ex. N (Dept. of VA Memo. dtd. Nov. 8, 1999).

On November 29, 1999, Morin returned to work. Doc. #25 (Owen Dep. dtd. July 24, 2003) at 55. Upon his return, he was stripped of his arrest authority, detailed to transportation and instructed to have no contact with Owen, pending a decision on disciplinary action. Id. at 54-56. On December 31, 1999, Owen filed a formal EEO Complaint. Id. at 56.

Over the next couple of months, Morin and Owen had four chance encounters in general work areas. Id. On March 3, 2000, Morin left federal service.[5] Id. at 56-57.


B.   Morin's Past Actions with Other Female Employees

In her memorandum in opposition to the Secretary's Motion for Summary Judgment, Owen attempts to establish that Morin had inappropriate relationships

_____

[5]According to the director of the DVA, Dr. Steven Cohen, the DVA terminated Morin, but Morin resigned before his termination took effect. Doc. #51, Ex. K (Cohen Interview) at 6, 9.

6

with three other DVA female employees prior to the encounter with her in September, 1999. The parties portray Morin's interaction with these women in a considerably different fashion. After reviewing the evidence in the light most favorable to Owen, the Court provides the following summary of Morin's relationships with these three women.

The first woman testifies that she and her husband were friends with Morin. Doc. #58, Attach. #1 at 6,11, 18.[6] She denies any relationship other than friendship, as well as any improper physical contact. Id. at 9-11. There is no indication that she ever complained to anyone at the DVA about Morin's conduct, see id. at 1-18, although another employee, Connie Ristaneo, reported to two

---

[6]The Defendant filed the transcript of this woman's sworn interview (along with other such sworn interviews), which was taken in connection with the investigation of Owen's sexual harassment claim. Doc. #58, Attach. #1. When reading the transcript, it is quite clear that this woman was surprised at the scope of the questions being asked, having thought she was being interviewed about the situation between Owen and Morin, rather than about herself and Morin. E.g., id. at 9 ("I thought this whole thing was that I was being a witness to something that happened between Gwen and him . . . so why am I being [asked] all these questions regarding myself?"). When asked to sign the typed transcript of the interview, the woman hand-wrote the following, part of which was deleted in the course of copying the document to file with the Court: "I feel I was put on the spot and did not like the questioning. I feel things were taken out of context regarding my friendship with a fellow employee. I was upset and thrown off guard when I was asked a lot of these questions and I rambled on about nothing. Officer Morin is a friend of my husband and mine and I don't appreciate you or anyone [remaining text cut off]." Id. at 18.

The Plaintiff characterizes the allegations of misconduct with this woman as follows: "Sergeant Morin was involved in an improper relationship with DVAMC employee [name omitted]." Doc. #51 at 3 (citing interviews of two other employees who speculated about such a relationship based on seeing Morin and the woman talking and sometimes taking walks together).

7

supervisors that she felt there was an improper relationship between Morin and the woman, because she had seen them walking together and talking to each other. Doc. #51, Ex. F (Ristaneo Interview) at 13.[7]

According to the second woman with whom Morin allegedly had an improper relationship, she and Morin had a mutually flirtatious relationship, until she learned that he was married and put a stop to it. Doc. #51, Ex. C.  After that, Morin sometimes tried to hold her hand or kiss her on the cheek, but she did not allow it. Id. at 7-8.  She did not report Morin's conduct to anyone with authority at the DVA. Id. at 14.

The parties offer no testimony from the third woman.  However, a police officer testifies that sometime in the mid to late 1990s, he prepared a Uniform Offense Report based on information he received from the woman about Morin allegedly sexually harassing her. Doc. #51, Ex. M (Walter Aff.) ¶ 2.  According to general practice, a copy of the Report would normally have been given to the accused's supervisor, as well as to the Chief of Police.[8] Id.  Ultimately, the woman

---

[7]According to Ristaneo, rather than doing anything about the situation, Morin's supervisor told her, "it [is] their business what they do." Doc. #51, Ex. F (Ristaneo Interview) at 13.

[8]Officer Walter offers contradictory testimony in his Affidavit, dated April 10, 2008 , and his deposition, dated September 20, 1999. E.g., Doc. #51, Ex. G at 6 (noting that the alleged assault was investigated by Lieutenant McMillian); Doc. #51, Ex. M (Walter Aff.) ¶ 4 (stating that he was not aware of any investigation that was ever conducted in the matter).  The Court will only consider that testimony which is consistent, in its analysis herein.  Furthermore, both of the parties point to various parts of Walter's testimony that contain inadmissible hearsay, which will likewise not be considered herein.

withdrew her complaint, and the reporting officer's supervisor determined that he had improperly handled the incident, by too aggressively pursuing the complaint. Doc. #51, Ex. G (Walter Interview) at 7.

C.    General Information about Owen's Employment History

A month after the alleged assault, on October 10, 1999, Owen applied for and received a new position, customer service representative, a job in which she had greater opportunity for advancement. Doc. #25 (Owen Dep. dtd. July 24, 2003) at 65-66.  In June, 2000, she was promoted from a GS-5 to a GS-6. Id. at 66.  From that time until the date of her deposition (July 24, 2003), Owen received regular step increases. Id.  As will be more fully described *infra*, on December 27, 2007, the DVA terminated Owen from her then current position. Doc. #51, Ex. O (DVA Memo. dtd. Dec. 27, 2007).

D.    Alleged Acts of Retaliation

Upon her reassignment to the position of customer service representative, in October, 1999, Owen's supervisor was still DiVincenzo. Doc. #26, Ex. A (DiVincenzo Aff.) ¶ 9.  The lead clerk (not a supervisor) in Owen's section was Delorise Turner, who was responsible for scheduling and timekeeping for the customer service representatives. Doc. #26, Ex. B (Turner Aff.) ¶ 2.  The first day Owen was on her new job, Turner said to her, "we've heard about you." Doc. #25

9

(Owen Dep. dtd. July 24, 2003) at 78.  Owen feels that this comment was related

to her filing of the informal EEO Complaint against Morin.[9] Id.  at 79.

_____

[9]Owen's testimony on this point is contradictory.  The following communication transpired at her deposition:

Q:    You say Ms. Turner informed you that, quote, we've heard about you, end quote.  Tell me what that's all about.
A:    It was in the first, it was probably the first day that I was there and we were getting introduced and just out of the blue that's what [Turner] said, we've heard about you.
Q:    Okay.  Did she expound on that at all?
A:    I don't remember.
Q:    Did she go on and say what it was that she heard about you?
A:    No.
Q:    Do you have any idea what she was referring to?
A:    I believe she was referring to the Morin incident and the subsequent investigation.
Q:    That's your personal belief that that's what she was referring to?
A:    I don't remember the exact conversation that followed, but it had to do with the Morin incident and the aftermath.
Q:    But you don't remember her expanding on . . . what she said, quote, we've heard about you?
A:    I don't remember the details.
Q:    Well do you remember generally what was said?  I mean if you don't remember, fine.  I'm just asking what you remember.
A:    No.

Doc. #25 (Owen Dep. dtd. July 24, 2003) at 78-79.  In a later affidavit, Owen states that "upon my transfer to the customer service department in November 1999, I was informed by Delorise Turner, Customer Service Group Leader, that "we heard about you."  When I asked Ms. Turner why she had heard about me, she responded "that thing with that police officer." Doc. #51, Ex. L (Owen Aff.) ¶ 8.
        According to Turner, however, she had not been aware of the EEO Complaint when Owen first began working in her section, but only became aware of it after Owen told her and the other customer service representatives about it at a later point in time. Doc. #26, Ex. B (Turner Aff.) ¶¶4,5; see also Doc. #25 (Owen Dep. dtd. July 24, 2003) at 99-100 (confirming that she did talk to her new co-workers about the situation).  As to what she meant by the "we've heard about you" comment, Turner does not remember making such a comment, but states

10

Owen describes her work relationship with Turner as contentious. Specifically, Owen alleges that she suffered many injustices as a result of Turner's actions, to wit: being embarrassed and humiliated and having Turner yell at her in front of co-workers and patients[10]; leaving notes in plain view on her computer monitor regarding time records and leave requests; announcing Owen's leave requests and telling co-workers they would need to cover her hours; submitting false complaints to the supervisor concerning work hours, when she did not do so for other customer service representatives; and being the only one of seven employees that was scheduled to work three Christmases in a row. Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 72-73; Doc. #51, Ex. L (Owen Aff.) ¶¶ 8,9. According to Owen, she tried discussing her concerns about Turner's conduct with their supervisor, DiVincenzo, who refused to discuss the situation unless it involved disciplinary (as opposed to non-disciplinary) action against Owen. Doc. #51, Ex. L (Owen Aff.) ¶ 9.

Owen's allegations of mistreatment are not limited solely to Turner.[11] She

_____

that if she did so, it would likely have been because DiVincenzo had told her that Owen was a good worker and would require minimal training. Doc. #26, Ex. B (Turner Aff.) ¶¶ 3,4.

[10]The seven customer service representative worked in one small open room. Doc. #25 (Owen Dep. dtd. July 24, 2003) at 84, 89.

[11]In her responsive brief, Owen also alleges that she "was subjected to investigations alleging misconduct by herself in an effort to find some evidence to discredit Ms. Owen" and that the "[DVA] investigated Ms. Owen 'for anything that came up, and yet when [Ms. Owen] had a serious allegation, they did nothing with it.'" Doc. #51 at 8. The Deposition pages cited in support of this text indicate only

also makes the following unrelated allegations, all of which she asserts were in

retaliation for her filing of the EEO complaint against Morin:

- The Police and Security Service were not responsive when she reported the theft of her purse and were also not cooperative in giving a police report to her credit union. Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 5-9.

- The LMS department (it is unclear what "LMS" stands for) obstructed her request to get a copy of the report of Morin's sexual assault investigation. Id. at 46-48.

- Beginning in January, 2000, Paul Calloway (title and department unknown) did not give Owen the opportunity to work as many voluntary, overtime hours at Health Fairs,[12] after filing the EEO claim, resulting in a loss of significant overtime pay. Id. at 14, 17-18; Doc. #51, Ex. L (Owen Aff.) ¶ 11.

- She received verbal counseling from Carol Volkerding and Dr. Sharrett (titles and departments unknown) for having a messy office, yet another employee (Darrell Watson) had a messier office, but was not counseled.[13] Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 128-31.

---

that Owen made the statement that "[DVA] investigated me for anything that came up, and yet when I had a serious allegation, they did nothing with it." Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 92. It does not provide any information about what sorts of investigations they made of Owen nor in what way they ignored her serious allegations (with the exception of alluding to a non-specific complaint she made about a man flaunting his infidelity). Thus, the Court will not consider the same in its analysis herein.

[12]Health Fairs were special assignments where DVA employees participated in outreach to the community - - - telling people, for example, about the benefits and costs of the services at the VA. Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 14-15.

[13]Darrell Watson testifies that he does not know whether Owen was ever counseled about the condition of her office, but that the two of them had almost the same amount of paper in their areas. Doc. #51, Ex. J (Watson Dep.) at 31-32.

• According to Owen, although she was qualified for two other jobs she applied for, Human Resources did not give them to her, saying she was not qualified. Id. at 74-76.

• In early 2002, a volunteer employee threatened to kill Owen and another employee, yet was not removed from the DVA. Id. at 98-99. The volunteer was, instead, reassigned to work in another area. Id. The people allegedly responsible for these actions were Sharon Croteau and Bob Moore (titles and departments unknown). Id. at 99. Owen also objected to the way the police handled the investigation of this threat, feeling that she was treated as the wrong-doer by the investigating officer, Lieutenant Minnifield. Id. at 101-05.

• Owen was in receipt of a note from her doctor saying she needed to take some time off of work. Id. at 54. When she gave the note to Ron Mellon, Chief of Patient Business Service, he disapproved it, saying the note did not tell him why she needed the leave time.[14] Id. at 54-55.

• At some point in time, Owen wanted to transfer between departments and requested the assistance of her friend, Darrell Watson, in making the transfer happen. Id. at 110-13. Watson spoke to Bill Ensley, Chief of Human Resources, about transferring a group of people, which included Owen. Doc. #51, Ex. J (Watson Dep.) at 32-38. In the course of this conversation, Ensley allegedly told Watson that he would transfer Owen, if she would drop her EEO complaint.[15]

---

[14]Owen also states that she overhead Mellon saying, "Get to her. We have to get somebody to her now." Doc. #51 at 10 (citing Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 56; Doc. #51, Ex. L (Owen Aff.) ¶ 14). Because Owen offers no explanation of what this statement means, the Court disregards it in its analysis herein.

[15]According to Owen's hearsay testimony, when Watson spoke to Ensley, Ensley told him that he could make Owen's transfer happen if she would drop her EEO complaint against Morin. Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 111-13. Watson testifies that Ensley "said something about [Owen's] EEO complaint" and something "about her dropping it." Doc. #51, Ex. J (Watson Dep.) at 32-38. Although Watson's statement does not specifically substantiate Owen's allegation that Ensley told Watson that he would transfer her if she dropped her complaint, such an allegation is a fair inference from Watson's testimony.

Watson's statement, although hearsay, would be admissible under Federal Rule of Civil Evidence 801(d)(2)(D), as an admission by a party-opponent, given Ensley's position as the DVA's Chief of Human Resources.

- In 2007, the DVA improperly denied Owen's request to take extended leave to finish sign language schooling. Doc. #51, Ex. L (Owen Aff.) ¶ 16.

- On December 27, 2007, the DVA terminated Owen from her position.[16] The DVA cites 45 separate specifications of absence without leave as its reason for the termination. Doc. #51, Ex. O (DVA Memo. dtd. Dec. 27, 2007); Doc. #51, Ex. P (DVA Memo. dtd. July 26, 2007). Owen has appealed this decision to the Merit Systems Protection Board, claiming that her request for leave without pay was improperly denied, as a result of the continuing retaliation she has endured for filing the EEO complaint.[17] Doc. #51, Ex. L

---

[16]This event did not happen until about eight years after the Plaintiff filed her EEO Complaint. While an argument could have been made that the Court should not consider this part of the claim, due to the Plaintiff's failure to exhaust administrative remedies, such a failure is waivable. Zipes v. TWA, 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); see also Flowers v. Potter, 2008 U.S. Dist. LEXIS 23980, **30-35 (S.D. Ohio Mar. 11, 2008) (applying the "scope of investigation" doctrine in determining that plaintiff failed to exhaust administrative remedies as to claim of constructive discharge). Because the Defendant did not raise the issue of the Plaintiff's failure to exhaust her administrative remedies with regard to the wrongful discharge, the Court considers it to be waived. Lockett v. Potter, 2008 U.S. App. LEXIS 923, **3-4 (6th Cir. Jan. 9, 2008) ("Failure to exhaust administrative remedies in a timely manner is an affirmative defense, and the defendant bears the burden of pleading and proving this failure.") (citing Williams v. Runyon, 130 F.3d 568, 573 (3rd Cir. 1997); Bowden v. United States, 323 U.S. App. D.C. 164, 106 F.3d 433, 437 (D.C. Cir. 1997)).

[17]Owen applied for leave without pay to finish sign language schooling, but the VA denied her request due to a lack of manpower. Doc. #51, Ex. L (Owen Aff.) ¶ 16; Doc. #51, Ex. Q (Ltr. from Pl.'s Counsel to DVA, dtd. Sept. 13, 2007). Owen apparently took 45 days off work, despite the denial of her request, and was then terminated for being absent without leave. Doc. #51, Ex. O (DVA Memo. dtd. Dec. 27, 2007); Doc. #51, Ex. P (DVA Memo. dtd. July 26, 2007). Owen claims that the denial was improper because the evidence file produced by the DVA does not contain any indication that Owen's absence would create a manpower burden on the DVA, thus indicating (in Owen's opinion) that the denial of her request was, instead, a result of continuing retaliation for her 2001 EEO activity. Doc. #51, Ex. Q (Ltr. from Pl.'s Counsel to DVA, dtd. Sept. 13, 2007).

(Owen Aff.) ¶ 16; Doc. #51, Ex. Q (Ltr. from Pl.'s Counsel to DVA, dtd. Sept. 13, 2007).

In her memorandum in opposition to the Secretary's Motion for Summary Judgment, Owen also asserts various other "facts" to which the Court does not allude here, given that they rely for support on inadmissable hearsay evidence.[18]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

---

[18]For example, Owen testifies as to various hearsay statements made by her friend, Marvin Vance. Doc. #51, Ex. L (Owen Aff.) ¶ 11 (alleging that Vance told her that she was not given the opportunity to work at as many health fairs, because of her sexual assault claim); Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 20-22 (asserting that Vance stated that he had been told (by an unspecified person) to "stay away from [Owen, because she is] bad news," because of the incident with Morin); id. at 23-25 (reporting that Vance told her that no one would want her to work for them, because of her sexual assault complaint). But see Doc. #51, Ex. I (Vance Dep. Mar. 18, 2008) at 14-19 (testifying that he had no recollection of telling Owen those statements about which he was questioned). Since Owen has not attempted to establish any exception to the hearsay rule for these statements, or any other independent basis for considering such statements, for example that Vance is an agent of the Defendant, the Court will not consider the same in ruling herein. See Fed. R. Civ. Proc. 801(d).

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th

16

Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

17

III.     CO-WORKER HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

Title VII makes it unlawful for an employer to discriminate against an employee with respect to her compensation, terms, conditions or privileges of employment, on the basis of sex. 42 U.S.C. § 2000e-2(a)(1).  Two types of harassment may constitute discrimination on the basis of sex:  "quid pro quo harassment, in which a supervisor requests sexual favors in exchange for job benefits, and 'hostile work environment' harassment, in which a pervasive atmosphere of sexual harassment creates an objectively hostile work environment." Blankenship v. Parke Care Ctrs., 123 F.3d 868, 872 (6th Cir. 1997).  Hostile work environment cases, such as that alleged by Owen herein, can be further divided between cases involving harassment by supervisors and those involving harassment by co-workers. Id.

In order to establish a co-worker hostile work environment claim, a plaintiff must demonstrate that:

(1) she was a member of a protected class;

(2) she was subjected to unwelcome harassment;

(3) the harassment complained of was based upon sex;

(4)  the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and

(5)  the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action.

Fenton v. HiSAN, Inc., 174 F.3d 827, 829-830 (6th Cir. 1999).  The Secretary

18

does not dispute the first three elements of the Plaintiff's *prima facie* case.  Rather, he asserts that the Plaintiff's claim fails for lack of sufficient evidence to support the fourth and fifth prongs. Doc. #26 at 9-13.  Because the Court agrees that the Plaintiff has not satisfied the fifth prong of her *prima facie* case of hostile work environment sexual harassment, as further described below, the Court finds it unnecessary to consider the arguments pertaining to prong four.

      A.      <u>Legal Standard for Determining Whether Employer Knew or Should Have Known of Sexual Harassment and Unreasonably Failed to Take Prompt and Appropriate Corrective Action</u>

Because the alleged sexual harasser in this case (Morin) was a co-worker instead of a supervisor, the Secretary can only be held liable if he "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." <u>Blankenship v. Parke Care Ctrs.</u>,123 F.3d 868, 872-73 (6th Cir. 1997).  "In determining whether a response was 'prompt and appropriate,' negligence in fashioning a remedy is not sufficient for the employer to incur liability." <u>Nievaard v. City of Ann Arbor</u>, 2005 U.S. App. LEXIS 3690, *18 (6th Cir. 2005) (citing <u>Blankenship</u>, 123 F.3d at 873).  Rather, an employer is only liable "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 338 (6th Cir. Ohio 2008) (quoting <u>Blankenship</u>,123 F.3d at 872-73).  "A response is generally adequate, however, if it is 'reasonably calculated to end the harassment.'" <u>Id.</u> at 340 (citing <u>Jackson v. Quanex Corp.</u>,

191 F.3d 647, 663-64 (6th Cir. 1999)).  Finally, the Sixth Circuit clarifies that

"[t]he act of discrimination by the employer in such a case is not the harassment,

but rather the inappropriate response to the charges of harassment." McCombs v.

Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005) (citing Blankenship, 123 F.3d at

873).


      B.     Whether Secretary Knew or Should Have Known of Morin's Sexual
             Harassment and Unreasonably Failed to Take Prompt and Appropriate
             Corrective Action

      Owen alleges that the Secretary knew of the sexual assault, yet failed to

take prompt or appropriate action.  Owen also asserts that the Secretary knew of

Morin's past incidents of sexual harassment.[19]  The Court can quickly dispense

with the second part of the Plaintiff's allegation, in that she has set forth no facts

to indicate that the Secretary was aware of any past incidents of sexual

harassment involving Morin.  Of the three women with whom Morin allegedly had

improper relationships, only the third reported Morin's actions to an authority figure

at the DVA.  However, this woman withdrew the complaint that was filed and the

officer making the report was reprimanded for too aggressively pursuing the

_____

     [19]It is unclear what the Plaintiff is contending with this line of argument.
While the Sixth Circuit has recognized that knowledge of prior acts of sexual
harassment by an employee may support a claim that an employer had constructive
knowledge of later acts by the same employee, Hawkins, 517 F.3d at 340 (citing
Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 423 (11th Cir.
1999)), it is undisputed, in the present case, that the Defendant knew of the
alleged incident of sexual abuse involving Morin and Owen.

complaint.[20]  There being no genuine issue of material fact as to whether the Secretary knew of Morin's past incidents of sexual harassment, the Court will now turn to the Plaintiff's allegations pertaining to Morin's sexual assault on her.

As to the incident between Morin and the Plaintiff, there is no dispute that the Secretary "knew" of the allegations, as of September 2, 1999.  Therefore, the only question is whether the Secretary's corrective actions were "prompt and appropriate."

Focusing only on the eleven days between when she reported the assault to her supervisor (September 2) and when Morin went on administrative leave (September 13), the Plaintiff asserts that the DVA's response was not "prompt", arguing that the DVA took no action until she (Owen) notified the Cleveland-based ORM.  Further, she argues that the response was not "appropriate", because Owen saw Morin in general work spaces on three or four occasions during the week after the assault and that Hudson (the local EEO counselor) wrote an incomplete report, after embarrassing her by conducting part of her interview in her work space with her co-workers present.  She further points to Dr. Cohen's admission that he was "upset with the way [the investigation] was handled initially internally."  In legal support of her claim, Owen cites Judge Smith's decision, in <u>Nelson v. Wal-Mart</u>

---

[20]Given the first woman's testimony that she was not involved in an inappropriate relationship with Morin, the Court puts no credence in the report made by the co-worker, Connie Ristaneo, to the supervisors, that she felt there must have been an inappropriate relationship because she saw Morin and the woman talking and taking walks together.

Stores, 2002 U.S. Dist. LEXIS 23543 (S.D. Ohio Oct. 31, 2002).

In Nelson, a co-employee allegedly made multiple sexually explicit and offensive remarks to the plaintiff.  In determining that summary judgment in favor of the defendant employer was appropriate, the court pointed to the fact that the defendant store managers "immediately took action upon being informed of the alleged harassment." Id. at *20.  The actions taken by the employer included sending the alleged harasser home, instituting an investigation of the plaintiff's allegations, and interviewing the plaintiff, offender and others. Id. at **20-21.

The Plaintiff, in the present case, points to Nelson in arguing that the Secretary did not satisfy the "prompt and appropriate" standard, because the local EEO counselor (Hudson) did nothing more than write an incomplete report, in contrast to the more comprehensive actions taken by the employer in Nelson and intimating that the eleven day gap between her report of the incident and Morin going on administrative leave was not "immediate" enough. Doc. #51 at 15.

While the Court agrees that Hudson's actions were likely not sufficient, the Plaintiff overlooks the actions taken by the other people at the DVA, specifically Chief Parrott and the facility director, Dr. Cohen.  The Plaintiff initially reported the incident to her supervisor on the afternoon of Thursday, September, 2.  Sometime during the following week, Parrott ordered Morin to stay out of the Plaintiff's work space.  On Friday of that week (September 10), Dr. Cohen ordered Morin put on administrative leave (which he instructed to begin the following Monday, after

22

confirming that the Plaintiff was not working the intervening weekend).  The fact

that the Plaintiff initiated contact with both Parrott and the ORM (which

supposedly contacted Dr. Cohen), rather than Hudson making those contacts, is

inconsequential.[21]  The reality is that within eight days of the Plaintiff's report, the

Secretary had ordered Morin put on administrative leave and, in the meantime, had

instructed him to stay out of the Plaintiff's work area.  Moreover, although the

Plaintiff observed Morin in general work areas during the intervening time period,

no harassment occurred.  The Sixth Circuit has offered as a gauge of the

appropriateness of the conduct whether the employer took steps that were

"reasonably calculated to end the harassment." Hawkins v. Anheuser-Busch, Inc.,

517 F.3d 321, 340 (6th Cir. 2008); see also Baugham v. Battered Women, Inc.,

2006 U.S. App. LEXIS 31722, *23 (6th Cir. Dec. 20, 2006) (pointing to the fact

that "[p]laintiffs' own evidence supports a conclusion that after they filed the

grievance they did not observe [the harasser] engage in any harassing behavior").

Given that no harassment occurred between the time the Plaintiff initially reported

the incident and when the Secretary placed Morin on administrative leave, the

─────────────

        [21]The parties have offered no information to the Court as to the contents of
the DVA sexual harassment policy, or even if such a policy exists.  It is unclear
whether the Plaintiff's responsibility stopped at reporting the alleged abuse to the
local EEO counselor, Hudson, or whether she was required to also make a report to
the ORM.  The fact that the Plaintiff's supervisor gave her the contact information
for the ORM at their initial meeting, on September 2, further clouds this issue.
Regardless of whether it was the Plaintiff's responsibility to make such contact or
not, she did, in fact, contact the ORM, making it impossible to determine how the
facts would have unfolded had she not done so.

Court concludes that the Secretary's response did not manifest "indifference or unreasonableness."  Because there is no genuine issue of material fact on this point, the Defendant's Motion for Summary Judgment (Doc. #37) is SUSTAINED, as to Count I - - - the Plaintiff's co-worker sexual harassment claim.


IV.    RETALIATION

In the Plaintiff's second cause of action, she alleges that various people subjected her to retaliatory treatment as a result of her report of the sexual assault, in violation of Title VII. Doc. #1.  The Secretary moves for summary judgment on this claim, challenging the sufficiency of the Plaintiff's evidence in establishing her *prima facie* case of retaliation. Doc. #26.

The Plaintiff argues that she suffered from both supervisor retaliation and co-worker retaliation.  The Court's first task is to discern which of the Plaintiff's assertions are made against "supervisors" and which are made against "co-workers."  In so doing, it will turn to Title VII's statutory provisions and courts' interpretations of the same.

As previously stated, Title VII makes it unlawful for an employer to discriminate against an employee, on the basis of sex. 42 U.S.C. § 2000e-2(a)(1).  Furthermore, in its retaliation provisions, Title VII prohibits "employers" from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  The

24

statute defines the word "employer" to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b) (emphasis added).

Although the statute does not define the word "agent", the Supreme Court helps to fill out the contours of this word by explaining that Title VII applies to the actions of "a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998). The Court further explains that "[w]hen a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation." Id. at 762. In sum, then, an "agent", for purposes of 42 U.S.C. § 2000e(b), is "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." Wathen v. GE, 115 F.3d 400, 405 (6th Cir. Ky. 1997) (internal quotation omitted). The Court will now turn to an analysis of which of the Plaintiff's claims are made against her supervisors (or "employer") and which are made, instead, against her co-workers.

As more thoroughly explained, *supra*, the Plaintiff makes the following allegations against various people with whom she worked:

- Various Allegations of Mistreatment by Lead Clerk. Turner, the lead clerk, allegedly mistreated the Plaintiff in numerous ways, to wit: embarrassing and humiliating her; yelling at her in front of co-workers and patients; leaving notes on her computer monitor regarding time

25

records and leave requests; announcing her leave requests and telling co-workers they would need to cover her hours; submitting false complaints to the supervisor concerning work hours; and scheduling her to work three Christmases in a row.

- <u>Investigation of Theft of Purse</u>. The "Police and Security Service" improperly investigated the theft of her purse.

- <u>Obstruction of Effort to get Copy of Assault Investigation</u>. The LMS Department obstructed her efforts to get a copy of the assault investigation.

- <u>Reduction of Overtime Hours at Health Fairs</u>. Paul Calloway reduced the Plaintiff's overtime hours at the Health Fairs, without justification.

- <u>Verbal Counseling for Messy Office</u>. Carol Volkerding and Dr. Sharrett improperly counseled her on the condition of her office.

- <u>Failure to be Offered Other Jobs</u>. Human Resources did not offer the Plaintiff two jobs, for which she applied and was allegedly qualified.

- <u>Threat by Volunteer Employee</u>. Sharon Croteau and Bob Moore did not remove a volunteer employee who threatened to kill the Plaintiff and another employee. Further, Police Lieutenant improperly handled the investigation into that event.

- <u>Improper Denial of Request for Medical Leave</u>. The Chief of Patient Business Service improperly disapproved Plaintiff's request for medical leave.

- <u>Transfer Contingent on Dropping EEO Complaint</u>. The Chief of Human Resources stated that he would transfer Owen, if she would drop her EEO complaint.

- <u>Denial of Request for Extended Leave</u>. The DVA denied Owen's request to take extended leave to finish sign language schooling, without justification.

- <u>Improper Termination</u>. The DVA improperly terminated Owen.

In applying the Sixth Circuit's direction that an agent of an employer is "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment" and interpreting the facts in the light most favorable to the Plaintiff, the Court concludes that the following allegations can arguably be considered as being retaliatory actions by the Plaintiff's "employer":  (1) the reduction of the Plaintiff's overtime hours at Health Fairs (based on the inference that Paul Calloway was her supervisor at the Health Fairs and issued the invitations to work there); (2) the Human Resource Department's failure to select the Plaintiff for two new jobs; (3) the Chief of Patient Business Service's disapproval of her medical leave; (4) the statement by the Chief of Human Resources that he would transfer the Plaintiff, if she would drop her EEO complaint; (5) the DVA's denial of her request for extended leave for schooling, and (6) the DVA's termination of her.  Since the Plaintiff has not set forth evidence to indicate that any of her other allegations assert actions by someone in a supervisory capacity over her, the Court will consider those to be claims against co-workers.


A.    Supervisor Retaliation

In order to establish a *prima facie* case of supervisory retaliation under Title VII, an employee must establish that

(1)    she engaged in activity protected by Title VII;

     (2)    this exercise of protected rights was known to defendant;

     (3)    defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

     (4)    there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007), cert.

denied 128 S. Ct. 1657 (2008) (citing Morris v. Oldham County Fiscal Court, 201

F.3d 784, 792 (6th Cir. 2000)).  In general, the Secretary argues that the Plaintiff

has not set forth sufficient evidence to satisfy the third and fourth elements of this

claim. Doc. #51 at 14.  Specifically, as to the charge that the Plaintiff was stripped

of overtime opportunities at Health Fairs, however, the Secretary also asserts that

the Plaintiff has not satisfied the second prong of this test - - - the Defendant's

knowledge of the Plaintiff's EEO activity. Id. at 15.


       1.    Prong Two - Whether Exercise of Protected Rights was Known to Defendant

The second prong of a *prima facie* case of supervisor retaliation requires the

plaintiff to demonstrate that the exercise of her protected right was known to the

defendant.  Albeit in an unpublished opinion, the Sixth Circuit recently recognized

that a plaintiff can satisfy this burden either by direct evidence or by pointing to

evidence in the record from which that knowledge may be inferred. Scott v.

Eastman Chem. Co., 2008 U.S. App. LEXIS 8913, *44 (6th Cir. Apr. 22, 2008)

(citing <u>Proffitt v. Metro. Gov't of Nashville & Davidson County</u>, 2005 U.S. App.

LEXIS 21791 (6th Cir. Tenn. Sept. 25, 2005); <u>Kirkendoll v. McCullough</u>, 2006

U.S. Dist. LEXIS 1080 (M.D. Tenn. Jan. 3, 2006)).  In other words, a plaintiff

must set forth evidence "either direct or circumstantial, from which a reasonable

factfinder could conclude, or infer, that those [supervisors responsible for the

alleged retaliatory conduct] knew of her protected activity." <u>Id.</u>

The Secretary asserts that the Plaintiff has pointed to no evidence to

indicate that Calloway (the supervisor who allegedly excluded Plaintiff from the

opportunity to work overtime hours at Health Fairs) had any knowledge of her EEO

activity. Doc. #51 at 15.  The Plaintiff offers nothing in response.  Because the

Plaintiff has pointed to no evidence in the record, either direct or circumstantial,

from which a reasonable factfinder could conclude, or infer, that Calloway knew of

her protected activity, there is no genuine issue of material fact as to this aspect of

her supervisor retaliation claim.  Therefore, the Defendant's Motion for Summary

Judgment (Doc. #37) is SUSTAINED, as to that part of Count II that pertains to the

claim that Calloway retaliated against the Plaintiff by excluding her from overtime

hours at Heath Fairs.

     2.   <u>Prongs Three and Four - Adverse Employment Actions and
Causal Connections</u>

With the exception of the Plaintiff's claim that the Chief of Human

Resources made a statement indicating that he would transfer Owen, as she

requested, if she would drop her EEO complaint, the Court need not determine

whether any of the other alleged incidents of supervisor retaliation are "adverse

employment actions," as required by the third prong of her *prima facie* case,

because the Plaintiff has not set forth sufficient evidence as to the fourth prong - -

whether there was a causal connection between these claims and her filing of the

EEO Complaint.  The Sixth Circuit instructs that in order to show the requisite

causal connection,

> a plaintiff must produce sufficient evidence from which an inference
> can be drawn that the adverse action would not have been taken had
> the plaintiff not filed a discrimination action.  Although no one factor
> is dispositive in establishing a causal connection, evidence that the
> defendant treated the plaintiff differently from identically situated
> employees or that the adverse action was taken shortly after the
> plaintiff's exercise of protected rights is relevant to causation.

Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 413 (6th Cir. 1999).

As her causal connection argument, the Plaintiff asserts that she was treated

differently than other employees.[22]  In support thereof, she points to the following

deposition testimony of hers, which was responsive to a question about why she

felt the various alleged actions taken against her were in reprisal for her EEO

activity:  "Things that ha[ve] happened to me that had it been anyone else, it

would have been handled differently.  Things that I have seen them handle

---

[22]The Plaintiff also argues temporal proximity, but does not set forth any
facts to support that argument, with regard to any of the claims being analyzed as
supervisor retaliation claims.

30

differently with similar situations with someone else." Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 100.

Without more, the Court finds this statement to be insufficient to create a genuine issue of material fact as to whether there was a causal connection between the various, remaining alleged actions of the supervisors (i.e., failure to select Plaintiff for new jobs, disapproval of request for medical leave, denial of request for extended leave for schooling and termination). Furthermore, as to two of these alleged improprieties (denial of request for extended leave for schooling and termination), the lengthy time period between the two incidents and the exercise of her protected rights (eight years) weighs heavily against any implication that there is a causal connection between the events, without some evidence to the contrary.

At this juncture, then, the only supervisor retaliation claim remaining is the one pertaining to the statement allegedly made by the Chief of Human Resources, indicating that he would transfer Owen, as she requested, if she would drop her EEO complaint. The statement, in and of itself, indicates a causal connection between the Chief's failure to transfer Owen and her protected activity. Thus, the Court must now consider the third prong of the *prima facie* case, as to this remaining assertion - - - whether a failure to transfer is an "adverse employment action." Construing the evidence in the light most favorable to the Plaintiff leads the Court to conclude that the Plaintiff sought a lateral transfer, rather than a

31

promotion, since the Plaintiff points to no evidence to clarify what kind of transfer she sought or to indicate that the positions would be in any way different, except that they would be in different departments. Doc. #51, Ex. B (Owen Dep. Aug. 28, 2003) at 111-12 (speaking of her request for a "transfer" from the Customer Service Department to the Compensation and Pension Department). Contrast id. at 24 (indicating she had sought a "promotion" in another situation).

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment." EEOC v. Sundance Rehab. Corp., 466 F.3d 490, 501 (6th Cir. 2006) (quoting Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004); Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999)).  The Supreme Court recently determined that, in order to demonstrate an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006).  The Court clarifies that, when determining whether an action is materially adverse, "it is important to separate significant from trivial harms." Id.  "Title VII . . . does not set  forth 'a general civility code for the American workplace' [and thus, does not] immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998 (1998)).  With a focus on both the materiality of the challenged action and

32

the perspective of a reasonable person in the plaintiff's position, "this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." Id. at 70.  Examples of adverse employment actions include "firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." Sundance Rehab. Corp., 466 F.3d at 501-02 (quoting Smith, 378 F.3d at 575-76).

In a recently issued, unpublished opinion, the Sixth Circuit considered whether a request for a lateral transfer was an "adverse employment action." Momah v. Dominguez, 2007 U.S. App. LEXIS 15266 (6th Cir. June 21, 2007). Relying on its previous, more general determination that an "'adverse employment action' is one that results in a 'materially adverse change in the terms and conditions of [plaintiff's] employment'" and that a "'materially adverse' change in the terms or conditions of employment is typically characterized 'by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation,'" as well as on decisions from other circuits, the Court determined that "a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes." Id. at **25-26 (citing Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999); Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 886

33

(6th Cir. 1996); citations to other circuits' decisions concluding that lateral transfers are not adverse employment actions omitted).  Since, in that case, the plaintiff failed to present evidence from which a jury could conclude that the position he sought to leave was objectively worse than the position for which he sought a transfer, the Court concluded that he had not shown that he had suffered an adverse employment action. Id. at **29-30.

The same can be said of the present case.  The Plaintiff has set forth no evidence to indicate that the position she hoped to leave was objectively worse than the position she hoped to obtain or, in other words, that her retention in her then-current position constituted a "materially adverse change in the terms or conditions of her employment."  The Plaintiff has, therefore, not set forth sufficient evidence to create a genuine issue of material fact, as to the third prong of her prima facie case, on her claim that the Chief of Human Resources stated that he would transfer her, if she would drop her EEO complaint.

Because there is no genuine issue of material fact as to any of the allegations contained in the Plaintiff's supervisor retaliation claim (reduction of Health Fair overtime hours, failure to select her for new jobs, disapproval of medical leave, transfer contingent on dropping EEO complaint, denial of request for extended leave and termination), the Defendant's Motion for Summary Judgment (Doc. #37) is SUSTAINED, as to the part of Count II that constitutes the Plaintiff's supervisor retaliation claim.

34

B.    Co-Worker Retaliation

At this juncture, the only claims remaining are the Plaintiff's allegations of co-worker retaliatory harassment, to wit:  the lead clerk's multiple instances of alleged mistreatment (i.e., embarrassing and humiliating Plaintiff; yelling at her in front of co-workers and patients; leaving notes on computer monitor regarding time records and leave requests; announcing leave requests and telling co-workers they would need to cover work hours; submitting false complaints to supervisor concerning work hours; and scheduling her to work three Christmases in a row); Police and Security Service's improper investigation of purse theft; LMS Department's obstruction of efforts to get copy of assault investigation; Volkerding's and Sharrett's improper counseling on condition of office; Croteau's and Moore's failure to remove volunteer employee who threatened to kill Plaintiff and another employee; and Lieutenant Minnifield's improper handling of investigation of death threat.

The Sixth Circuit recently recognized that Title VII permits a claim for co-worker retaliation "in appropriate circumstances." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 346 (6th Cir. Ohio 2008).  In Hawkins, the Appellate Court stated that an employer will be liable for a co-worker's retaliatory conduct if:

> (1)    the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination,

(2)     supervisors or members of management have actual or
        constructive knowledge of the coworker's retaliatory behavior,
        and

(3)     supervisors or members of management have condoned,
        tolerated, or encouraged the acts of retaliation, or have
        responded to the plaintiff's complaints so inadequately that the
        response manifests indifference or unreasonableness under the
        circumstances.

Id. at 347 (citing Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53,

67-68, 126 S. Ct. 2405 (2006); Blankenship v. Parke Care Ctrs., 123 F.3d 868,

872-73 (6th Cir. 1997)).

Hawkins had not yet been decided at the time the Secretary filed his Motion

for Summary Judgment.  Although the case had been decided by the time the

Plaintiff filed her memorandum in opposition to the Secretary's Motion, she did not

address the impact of that case on her co-worker retaliation claim.

Because the parties have not briefed the impact of Hawkins on the case

presently before the Court, the Court hereby orders the Plaintiff to file, within

seven (7) calendar days of the date of this Order (with no extensions), a

memorandum addressing the impact of Hawkins on her co-worker retaliation claim,

the factual contours of which are specified supra.  The Defendant is then ordered

to file, within seven (7) calendar days of the date the Plaintiff files her

memorandum (with no extensions), a responsive memorandum addressing the

impact of Hawkins on the Plaintiff's co-worker retaliation claim, as specified herein.

36

Plaintiff may file a reply memorandum within three (3) calendar days thereafter (with no extensions).


V.    CONCLUSION

The Defendant's Motion for Summary Judgment (Doc. #37) is SUSTAINED, as to Count I, which alleges co-worker hostile work environment sexual harassment, and as to that part of Count II that alleges supervisor retaliation.   As to the remaining part of Count II, which alleges co-worker retaliation, the parties are instructed to file memoranda within the time periods stated herein.


September 2, 2008


                                    /s/ Walter Herbert Rice
                               WALTER HERBERT RICE, JUDGE
                               UNITED STATES DISTRICT COURT

Copies to:
Counsel of record